NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JACKIE RENEE SPIVEY,**

        **Plaintiff,**

**v.**                              **Case No. 6:16-cv-1705-Orl-40KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Jackie Renee Spivey, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 11, 13, and the parties' Joint Memorandum, Doc. No. 15.[1]

### PROCEDURAL HISTORY.

In 2011, Spivey filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.* She alleged that she became

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 14. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.* at 4.

1

disabled on October 19, 2010. R. 144. That application was denied initially, on reconsideration, by an Administrative Law Judge ("ALJ") and by the Appeals Council. On appeal of the final decision of the Commissioner to this Court, the Commissioner asked that the Court reverse the decision and remand the case for further proceedings, which request was granted. R. 537-38.

While the case was on appeal to this Court, Spivey filed a new application for OASDI benefits and for benefits under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.* R. 706-07.[2] The Appeals Council directed an ALJ to consolidate the applications, vacated the original decision, and required the ALJ to issue a new decision on the consolidated claims. R. 531.

In the order remanding the case for a new decision, the Appeals Council required the ALJ to resolve the following issue:

> The decision indicated that "significant weight" was given to Dr. Rho's opinion, specifying that the limitations identified by Dr. Rho would not preclude the claimant from work activity and were "less" than those indicated in the assessed residual functional capacity. In this regard, the residual functional capacity is less restrictive than suggested by the opinion of Dr. Rho. Specifically, the residual functional capacity does not accommodate the claimant's need for a sit/stand option, impaired ability to maintain attention and concentration, and up to three absences per month. Although the decision explains that the need to elevate legs is not supported by the evidence in the record, it does not provide an explanation for excluding the other limitations.

R. 532. The Appeals Council required the ALJ to give further consideration to the opinion of Christina Rho, M.D. *Id.*

The ALJ held another hearing on remand. Spivey, accompanied by an attorney, and a vocational expert ("VE") testified at the hearing. Additional documents were included in the

---

[2] The SSI application is not in the record before the Court. Doc. No. 15, at 2 & n. 1.

record following remand. After consideration of the testimony and review of the record, the ALJ issued a new decision on July 29, 2016. R. 469-83.

The ALJ found that Spivey was insured under OASDI through December 31, 2015. R. 472. The ALJ concluded that Spivey had not engaged in substantial gainful activity since October 19, 2010, the alleged disability onset date. R. 470, 472.

The ALJ found that since the alleged disability onset date, Spivey had the following severe impairments: diabetes mellitus, type II; peripheral neuropathy; obesity; bilateral knee osteoarthritis status postsurgery; lumbago; hypertension; reactive airway disease; and, osteoarthritis. R. 472. The ALJ found that the following impairments were not severe: possible carpal tunnel syndrome; history of diverticulitis; history of anxiety, NOS; history of depression; history of insomnia; and, history of phobia. R. 473.[3] The ALJ determined that Spivey's impairments, individually or in combination, did not meet or equal an impairment listed in SSA regulations. *Id*.

The ALJ concluded that before April 1, 2015, Spivey had the residual functional capacity ("RFC") to perform sedentary work, as follows:

> [S]he required the option to sit or stand alternatively, at will, provided she is within employer tolerances for off task behavior. She could never use her bilateral lower extremities for the operation of foot controls. She could never climb ladders, ropes, or scaffolds. [S]he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and/or crawl. She could use her bilateral upper extremities for frequent handling (gross manipulation) and fingering (fine manipulation). She needed to avoid even moderate exposure to environmental irritants such as fumes, odors, dusts and gases and poorly ventilated areas. The claimant needed to avoid concentrated exposure to the use of moving machinery and all exposure to unprotected heights.

---

[3] As to the alleged mental health impairments, the ALJ found that Spivey had mild restrictions in activities of daily living, maintaining social functional, and concentration, persistence or pace. R. 473. Spivey does not specifically challenge these findings in the Joint Memorandum.

3

R. 473-74. In reaching this conclusion, the ALJ gave partial weight to the September 2011 functional capacity assessment by Dr. Rho. R. 478-79.

The ALJ concluded that as of April 1, 2015, Spivey had the RFC to perform sedentary work as follows:

> [S]he required the option to sit or stand alternatively, at will, provided she is within employer tolerances for off task behavior. She could never use her bilateral lower extremities for the operation of foot controls. She could never climb ladders, ropes, or scaffolds. [S]he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and/or crawl. She could use her bilateral upper extremities for frequent handling (gross manipulation) and fingering (fine manipulation). She needed to avoid even moderate exposure to environmental irritants such as fumes, odors, dusts and gases and poorly ventilated areas. The claimant needed to avoid concentrated exposure to the use of moving machinery and all exposure to unprotected heights. Due to the combination of medical conditions, the claimant is unable to engage in sustained work activity on a regular and continuing basis for eight (8) hours a day, five (5) days a week, for a forty-(40) hour workweek or an equivalent schedule. (SSR 96-8p)[.]

R. 479-80. The ALJ cited in support of this conclusion an April 2015 x-ray of Spivey's right knee, which showed moderate to severe osteoarthritis, and a later MRI of the right knee showing osteoarthritis with a large complex tear of the medial meniscus and other impairments. The ALJ also cited Dr. Rho's finding in May 2015 that Spivey's diabetes was uncontrolled. The ALJ additionally gave great weight to the April 2016 functional capacity assessment of Alvan Barber, M.D., an examining physician. R. 480.

The ALJ found that Spivey could not perform any of her past relevant work as a nursery school attendant and nursing assistant. After considering the testimony of the VE, the ALJ determined that prior to April 1, 2015, there were sedentary unskilled jobs Spivey could perform, specifically addresser, document preparer and stuffer, each of which was available in the national economy. R. 482. The ALJ further found that beginning on April 1, 2015, there were no jobs that

NOT FOR PUBLICATION

Spivey could perform.   R. 482.   Therefore, the ALJ concluded that Spivey was disabled on April 1, 2015 but not earlier.   R. 483.   Spivey did not file exceptions to this decision.

Spivey now asks the Court to find that she was disabled from October 19, 2010 through March 31, 2015.   She does not challenge the ALJ's decision that she was disabled on and after April 1, 2015.

## JURISDICTION AND STANDARD OF REVIEW.

Spivey having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum and the ALJ's decision, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Spivey' privacy to the extent possible.

Spivey was born in 1974.   R. 706.   She completed school through the twelfth grade.   R. 46.   She stopped working in 2010 after missing work due to illness.   R. 48.   In a written report, she indicated that she was 5'3" tall and that she weighed 305 pounds.   R. 170.

*Diabetes Mellitus.*

Spivey was diagnosed with type 2 diabetes in 2000. R. 218. On March 15, 2010, Lee N. Metchick, M.D., F.A.C.E., examined Spivey at the request of her primary care physician, Susan A. Hole, M.D. Dr. Mitchick opined that Spivey had poorly controlled type 2 diabetes with neuropathy. R. 302. Dr. Hole's treatment notes reflect that Spivey's diabetes remained uncontrolled. *E.g.*, R. 247, 248, 250.

On September 29, 2010, Dr. Rho began treating Spivey for uncontrolled diabetes despite treatment with various medications. R. 218. At that time, Spivey's HbA1c level was 13.4%.[4] Spivey was morbidly obese, weighing 318 pounds. Dr. Rho adjusted her medication and instructed her about how much insulin to take. R. 219. On February 22, 2011, Spivey told Dr. Rho that she had not been able to afford insulin after she lost her job. Dr. Rho noted that Spivey also had diabetic neuropathy. R. 223.

Dr. Rho and Dr. Hole continued to treat Spivey's diabetes. On March 22, 2011, Dr. Hole noted Spivey's reports of numbness in her hands and feet. R. 237. On April 26, 2011, Dr. Hole noted what appeared to be evidence of diabetic neuropathy in Spivey's fingertips. R. 383. A nerve conduction study showed abnormal findings in the upper extremities considered to be diabetic polyneuropathy. R. 363. As of April 12, 2011, Spivey had lost some weight but she was still morbidly obese. Her HbA1c level had risen to 14.3%. Dr. Rho stated that Spivey's diabetes was still uncontrolled. She also suffered from diabetic neuropathy. R. 221-22. On July 6, 2011, Dr. Hole continued to document uncontrolled diabetes, as well as neurological manifestations (tremors of the mouth) and polyneuropathy. *E.g.,* R. 363-64.

---

[4] The reference range was less than 5.7%. R. 293.

NOT FOR PUBLICATION

On September 6, 2011, Dr. Rho prepared a functional capacity assessment. She opined that Spivey could walk about one block without rest or severe pain and she could stand for fifteen minutes at a time. In an eight-hour day, Spivey could stand/walk a total of less than two hours and sit at least six hours. Spivey would need to walk every ninety to 120 minutes and she needed to be able to change positions at will. Spivey would need a ten to fifteen minute break every ninety minutes. In a sedentary job, Spivey would need to elevate her legs at or above hip level 10% of the working day. Spivey could frequently lift less than ten pounds and occasionally lift up to twenty pounds. She could rarely climb ladders. She could occasionally twist, stoop (bend) and climb stairs. She should avoid concentrated exposure to extreme cold and heat, high humidity, wetness and cigarette smoke. She would likely be absent from work about three days a month. These limitations applied before September 28, 2010. R. 392-95.

Thereafter, Spivey's diabetes remained uncontrolled with worsening symptoms. On November 8, 2011, Dr. Hole noted that Spivey's diabetes was still uncontrolled and that she had peripheral neuropathy. R. 446. On January 26, 2012, Dr. Rho noted that Spivey had diabetes with neurological complications, which was uncontrolled. R. 402. On July 31, 2012, Spivey reported to Dr. Rho that she had neuropathic pain in her feet and blurry vision despite adjustment in her medication. R. 460. Dr. Rho's assessment that Spivey's diabetes was uncontrolled continued through 2015. *E.g.*, R. 821, 826, 831, 836, 842, 1115.

*Obesity*.

Medical records consistently reflect that Spivey was morbidly obese. *E.g.*, R. 219, 221, 367, 408, 853, 924, 936, 1021, 1137, 1153, 1159. Both Dr. Hole and Dr. White observed that Spivey's morbid obesity contributed to the problems in her knees. R. 937, 1020.

NOT FOR PUBLICATION

*Knee Pain and Osteoarthritis*.

On March 6, 2011, Spivey sought emergency department treatment for pain in both knees and in her right wrist/hand following a fall. R. 313. Upon examination, the treatment provider found normal range of motion and mild swelling in the right wrist and knees with stable knee joints. X-rays showed no acute bone injury. Motrin was prescribed. R. 315.

On March 30, 2012, Spivey sought emergency department treatment after falling and hurting her left knee. R. 416. An x-ray showed knee effusion, a slight lateral displacement of the tibia compare to the femur and a possible cruciate ligament injury. R. 415. On April 23, 2012, Spivey told Dr. Hole that she had increased left knee pain after falling a few days earlier. R. 434.

In early 2015, Spivey complained to Dr. Hole of pain in both knees and her right hip when walking. Dr. Hole observed that Spivey's right knee was tender medially, and she noted crepitus in the left knee. Her diagnoses included osteoarthritis of both knees. R. 924. X-rays of both knees taken on April 7, 2015 revealed moderate to severe osteoarthritis involving the medial femoral tibial joint and moderate osteoarthritis involving the patellofemoral joint. R. 1023-24. Thereafter, Spivey continued to report pain in her knees. On April 23, 2015, Dr. Hole wrote, "Her knees are killing her bilaterally due to her weight primarily. She is wearing out her joints. Knee X-ray shows moderate severe osteoarthritis." R. 1020.

Gregory G. White, an orthopedic surgeon, evaluated Spivey on November 4, 2015. He reviewed the April 2015 x-rays and wrote, in pertinent part, as follows:

> [S]he has bilateral medial compartment osteoarthritic degenerative changes. She has near bone-on-bone articulation noted, especially in the lateral. These x-rays are not performed standing. It shows significant arthritic changes. I discussed these findings with her and that some of her symptoms may be due to a degenerative tear of her medial meniscus.

R. 937. A subsequent MRI of the right knee revealed findings consistent with medial compartment arthritis and a degenerative tear of the medial meniscus. Dr. White's assessment was bilateral primary osteoarthritis of the knee. He told Spivey that she would require a total knee arthroplasty at some point, but he recommended arthroscopic surgery first. R. 940.

On December 8, 2015, Dr. White performed a medial meniscus tear excising and repair on Spivey's right knee. R. 948-49. Following the surgery, he prescribed a walker with a seat and hand breaks. R. 933.

Dr. Barber examined Spivey at the request of the Office of Disability Determination on April 26, 2016. Dr. Barber noted that Spivey weighed 344 pounds. R. 1153. Upon examination, he noted chronic positive muscle and joint pain and discomfort. R. 1154. Spivey had numbness and tingling in both hands and positive Phalen's and Tinel's signs on the right. R. 1156-57. She had numbness and tingling in both feet and straight-leg raising tests were positive for pain. R. 1157. Dr. Barber's impressions included poorly controlled diabetes mellitus, degenerative disc disease ("DJD") in the right knee, and morbid obesity. R. 1159.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Spivey asserts two assignments of error. First, she argues that the ALJ erred by failing to follow this Court's and the Appeals Council's remand orders requiring the ALJ to further evaluate the opinion of Dr. Rho. Second, she contends that the ALJ erred by failing to call upon a medical expert to establish the onset date of her disability. She asks that the Court reverse the final decision of the Commissioner and remand the case for an award of benefits. These are the only issues I will address.

NOT FOR PUBLICATION

*Remand Orders*.

In its remand order, this Court required as follows:

> Upon remand, Defendant shall direct the Administrative Law Judge to: (1) give further consideration to Plaintiff's medically determinable impairments at step 2 of the sequential evaluation process; (2) further evaluate the opinion evidence of record, including the opinion from Dr. Rho; (3) further consider Plaintiff's maximum RFC throughout the period at issue, with specific reference to evidence of record in support of the assessed limitations; and, (4) if warranted, obtain supplemental vocational expert evidence.

R. 538. In turn, the Appeals Council required the ALJ on remand to give further consideration to the opinion of Dr. Rho, noting that the original residual functional capacity did not address Dr. Rho's opinion that Spivey needed a sit/stand option, that she had an impaired ability to maintain attention and concentration, and that she would likely be absent from work up to three times per month. R. 532.

Spivey argues that the ALJ did not comply with these orders because she did not further consider Dr. Rho's opinion. She relies heavily on two sentences in the ALJ's decision, as follows: "Dr. Rho's assessment would preclude the claimant from work activity. The overall evidence *does* establish work preclusive or disabling symptoms." R. 479 (emphasis added). Counsel for the Commissioner argues that, in context, the second sentence should read that the overall evidence "does not" establish work preclusive or disabling symptoms. Counsel for the Commissioner's argument is compelling. The ALJ gave only partial weight to Dr. Rho's functional capacity assessment, and she found that Spivey was not disabled before April 1, 2015. Therefore, I recommend that the Court find that this patent typographical error in the ALJ's decision is insufficient to warrant reversal of the ALJ's decision.

Spivey also contends that the ALJ did not further consider Dr. Rho's functional capacity assessment. This argument also fails. The ALJ specifically addressed evidence regarding limitations in attention and concentration and found only mild restrictions. The ALJ also addressed Spivey's need for a sit/stand option and included that requirement in the RFC. The record supports a finding that the ALJ implicitly rejected Dr. Rho's opinion that Spivey would miss up to three days of work a month, based on the ALJ giving partial weight to Dr. Rho's opinion and not included that limitation in the RFC assessment. Accordingly, the ALJ's decision establishes that the ALJ did follow the orders of this Court and the Appeals Council to further evaluate Dr. Rho's opinion.

Therefore, the first assignment of error is not well taken.

*Medical Expert.*

In the second assignment of error, Spivey asserts that the ALJ erred by arbitrarily selecting April 1, 2015 as the date her condition became disabling. She contends that when, as here, a claimant has progressively worsening impairments, SSR 83-20 requires an ALJ to call on the services of a medical expert when a disability onset date must be inferred. Doc. No. 15, at 19-20 (quoting SSR 83-20, 1983 WL 31249, at * 2-3).

Counsel for the Commissioner concedes that the ALJ erred by failing to call a medical expert to assist in establishing Spivey's disability onset date. *Id.* at 22. They contend, nevertheless, that this error is harmless because substantial evidence in the record supports the ALJ's inference that disability began on April 1, 2015. Counsel then proceed to make an analysis of the record to support the ALJ's decision. *Id.* at 22-23. The law is clear, however, that an agency's action may be upheld based on the ALJ's opinion, without relying on a *post hoc*

NOT FOR PUBLICATION

rationalization. *Baker v. Comm'r of Soc. Sec.*, 384 F. App'x 893, 896 (11th Cir. 2010)(unpublished opinion cited as persuasive authority).

The ALJ did not state why she found that Spivey's condition was disabling as of April 1, 2015 and not before. Dr. White did not offer an opinion regarding when osteoarthritis in Spivey's right knee became disabling. Additionally, the evidence in the record shows that Spivey complained of knee pain from at least 2011, and Dr. Hole and Dr. White observed that Spivey's long-standing, morbid obesity contributed to the degeneration in her knees. Therefore, the record is insufficient to support the ALJ's determination that Spivey became disabled on April 1, 2015 but not earlier.

Under these circumstances, the requirements of SSR 83-20 must be followed. As another Judge of this Court wrote:

> The procedures in SSR 83-20 are more than bureaucratic rigmarole. They require the ALJ to obtain opinion evidence from a medical expert where an onset date must be inferred. As SSR 83-20 explains, drawing inferences about the onset date from medical records requires an "informed judgment" with a "legitimate medical basis." Id. at *3. A decision that relies on an inference that is not fully "informed" or lacks a "legitimate medical basis" is an inference unsupported by substantial evidence. . . . Because ALJs lack the expertise to evaluate the progression of slowly progressive impairments without the assistance of a medical expert, the ALJ was required to obtain expert testimony on the issue before reaching this conclusion.

*Touchton v. Comm'r of Soc. Sec.*, No. 6:14-cv-709-ORL-TBS, 2015 WL 12859393, at *6 (M.D. Fla. July 13, 2015).

Accordingly, the ALJ's failure to comply with SSR 83-20 was not harmless. Therefore, the second assignment of error is meritorious and requires that the final decision of the Commissioner be reversed and that the matter be remanded for further proceedings.

NOT FOR PUBLICATION

*Proceedings on Remand.*

Spivey asks the Court to remand the case with directions to the SSA to award her benefits as of October 19, 2010, her alleged disability onset date. However, remand for an award of benefits is appropriate only when "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). In this case, the Commissioner has not considered all of the essential evidence because the testimony of a medical expert is necessary to determine the date Spivey became disabled. Therefore, remand for benefits is not warranted.

Nevertheless, Spivey argues that she would suffer an injustice by further delay in awarding her benefits. The Eleventh Circuit has cautioned against awarding benefits based on delay in the administrative proceedings. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). Moreover, while the Commissioner should have followed SSR 83-20 initially, the evidence is insufficient to conclude that Spivey was, in fact, disabled as of October 19, 2010. Under these circumstances, requiring an award of benefits as of the alleged disability onset date is not appropriate.

Therefore, I recommend that the Court remand the case for further proceedings. The Court may require that the proceedings on remand be completed within a specific period of time and/or that the Commissioner file periodic status reports stating the progress of the proceedings on remand. *See, e.g., Bond v. Comm'r of Soc. Sec.*, No. 6:13-cv-175-Orl-36DAB, 2014 WL 12618197, at *3 (M.D. Fla. Jan. 27, 2014).

### RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** and that the matter be **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

### Notice.

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

**Respectfully Recommended** this 1st day of February 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE